UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINDA CHAMPAGNE,

Plaintiff,

v.

PLANNERNET, INC.,

Defendant.

Case No.  17-cv-02128-SK

**ORDER GRANTING PLAINTIFF'S MOTION TO CERTIFY CLASS**

Regarding Docket Nos. 28, 35, 36

Plaintiff Linda Champagne in this putative class action provided services at on-site events through a relationship with Defendant Plannernet, Inc. ("Plannernet").  Plaintiff alleges that Plannernet misclassified her and her coworkers as independent contractors when they were employees.  Plaintiff asserts, on behalf of herself and others similarly situated, the following claims:  (1) failure to pay overtime wages pursuant to Cal. Labor Code §§ 510, 1194, 1198; (2) failure to provide meal and rest breaks pursuant to Cal. Labor Code §§ 226.7, 512; (3) failure to pay wages for all hours worked pursuant to Cal. Labor Code §§ 200, 201.3, 218.6, 1194, 1194.2, 1197; (4) failure to pay wages in a timely manner pursuant to Cal. Labor Code §§ 201.3, 204; (5) failure to pay wages upon termination or resignation of employment pursuant to Cal. Labor Code § 203; (6) failure to reimburse expenses incurred in employment pursuant to Cal. Labor Code § 2802; (7) failure to provide accurate, itemized statements of wages pursuant to Cal. Labor Code §§ 201, 201.3, 202, 203, 204 , 218.6; and (8) unfair business practices pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Plaintiff also demands recovery under the Private Attorneys General Act ("PAGA"), Cal. Labor Code § 2698 *et seq.*

Plaintiff filed a Motion for Class Certification, in which Plaintiff asks the Court to certify a class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  The parties have

consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). A hearing on the motion was held on February 12, 2018. For the reasons stated below, the Court GRANTS the motion to certify the class proposed by Plaintiff for all claims asserted in the Complaint but with a modification to one claim.

## ADDITIONAL OBJECTION

Plannernet objects to the new evidence submitted in Plaintiff's Reply to this motion (Dkt. 34-1) and requests that the Court strike the Reply brief. (Dkt. 35.) Plaintiff requests an opportunity to file a Response to Plannernet's objection. (Dkt. 36, 36-1.) The motion to submit the Response to Plannernet's objection (Dkt. 36-1) is GRANTED. The Court considered the Response to Plannernet's objection in deciding this issue. (Dkt. 36-1.)

The Court in reviewing this motion relied on only the evidence submitted by Plaintiff in her opening brief and evidence submitted with her opening brief. The evidence submitted with the Reply brief was not relevant to the issues here. Plannernet merges a motion to strike evidence submitted with the Reply brief with a motion to strike the Reply brief itself. For this reason, the Court GRANTS Plannernet's motion to strike the evidence submitted in Plaintiff's Reply. The Court ORDERS that Exhibits 1, 2, 4, 5, and 6 are stricken from the record. Exhibit 3 is the same document submitted with the opening brief. (*Compare* Dkt. 28-2 *with* Dkt. 34-4.) However, the Court DENIES Plannernet's motion to strike the Reply brief. The Court did not rely upon the newly-submitted evidence and thus there is no reason to strike the entire Reply brief.

## BACKGROUND

Plannernet acts as a temporary staffing agency that provides its corporate clients with support staff for seminars, conferences, and trade shows at events in California and throughout the United States. (Dkt. 28-1, p. 1.) According to its mission statement, Plannernet strives "to be the premier provider of meeting management and support for professional meetings and events." (Dkt. 28-2, § II.) Plannernet supplies its clients, e.g., meeting and incentive companies, travel companies, medical education companies ("Clients"), with meeting and event service providers. (Dkt. 33, p. 4.) Plannernet enters into client service agreements with its Clients, providing access to event staffing in exchange for a fee. (Dkt. 28-1, ¶ 4.)

2

1    Plannernet's event service providers, called "suppliers," "meeting managers," or "vendors"

2    (referred to here as "Meeting Managers") must sign the Plannernet Independent Contractor

3    Agreement ("Agreement").  The parties submitted two versions of the Agreement: a version dated

4    2011 and labeled "Version 4.0" which is version signed by Plaintiff in 2014, and a version dated

5    October 2017 and signed by other Meeting Managers in 2017.  (Dkts. 28-4, 33-1, 33-2, 33-3, 33-6,

6    33-7.)[1]  Although Plannernet does not explicitly state that existing Meeting Managers signed new

7    agreements in 2017, the evidence submitted indicates that at least some Meeting Managers signed

8    the 2017 Agreement even though they began working for Plannernet before 2017.  (Dkts. 33-1,

9    33-2, 33-3, 33-7.)

10    Meeting Managers also signed a document stating that they had received and read the

11    Plannernet Meeting Manager Reference Guide" ("Guide").  (Dkts. 28-2; 28-4.)  When Plaintiff

12    signed on with Plannernet, she signed a document titled:  "Plannernet Meeting Manager Reference

13    Guide Version 4.0 Acknowledgement Form."  (Dkt. 28-4.)  The Guide states:

14    This handbook is intended to provide our meeting managers with general
     information and is not intended to create any contractual rights or obligations of
15    any kind.  All meeting managers will be given a copy of this guide and will be
     asked to acknowledge, in writing, that they have received and read the guide in its
16    entirety[.]

17    (Dkt. 28-2.)  The Guide states that Plannernet reserves the right to change the terms or rescind the

18    Guide at any time.  (*Id*.)

19    At oral argument, Plannernet asserted that Plannernet withdrew the Guide at some point in

20    2016.  However, there is no reference to that issue in the evidence submitted with this motion.

21    The only evidence of this statement in the record is that the 2017 Agreement does not incorporate

22    the Guide as part of the 2017 Agreement, but the Version 4.0 Agreement specifically refers to the

23    Guide and states that it was "hereby incorporated as part of this Agreement."  (*Compare* Dkt. 28-

24    4, ¶ 4, *with* Dkt. 33-1.)  Although the absence of the language about the Guide in the later

25    Agreement is inferential evidence that Plannernet ceased using the Guide in 2016, it is not

26    dispositive.

27

28    ───────────────
     [1]  As these are identical, the reference here will be to Dkt. 33-1.

**A.  Terms of the Agreements - Independent Contractor Status**

Both the Version 4.0 Agreement and 2017 Agreement claim to be contracts with independent contractors.  (Dkts. 28-4, ¶¶ 1, 10; 33-1, ¶ 4.)  The 2017 Agreement provides that the Meeting Manager is working through a "valid business entity" but the Version 4.0 Agreement does not contain this provision.  (*Id.*)  The 2017 Agreement requires that the Meeting Manager have "all applicable insurance" to run the business, and the Guide requires that Meeting Managers have insurance.  (Dkts. 33-1 at ¶ 1; 28-2 at §V.)  Plannernet does not provide any guidance to the Meeting Managers "as to how to perform client engagements."  (Dkt. 33-4, ¶ 19.)  At oral argument, Plaintiff claimed that, at larger events, one Meeting Manager would be designated as a "lead" to supervise the other Meeting Managers on site, but there is no evidence in the record to support this allegation.

**B.  Payment**

As to payment, the Version 4.0 Agreement provides that "[p]artial or full payment can be withheld from any assignment that does not meet the terms and conditions of the agreement (which included the terms and conditions of the specific assignment) or the Guide. (Dkt. 28-4, ¶ 4.)  Further, compensation may be withheld from the Meeting Manager if the services rendered do not meet the terms of the Agreement, the specific assignment duties, or of the terms of the Guide. (*Id.*)

The Guide provides 60 days to process Meeting Managers' fees and allows Plannernet to withhold payment where "the Plannernet Quality Service Committee determines that specific action by a Meeting Manager has jeopardized the integrity of the program or the relationship with a Client."  (Dkt. 28-2, § IX.)  The Guide also states that "Plannernet attempts to compensate our meeting manager for reserving time out of their [sic] schedule" when Clients cancel.  (Dkt. 28-2, § X.)

The 2017 Agreement provides that Plannernet "shall pay [Meeting Manager] the fees set forth in each [Statement of Work]" and that, unless otherwise specified, "no partial payments will be required for partial, incomplete or non-conforming Services."  (Dkt. 33-1, ¶ 3.)  The 2017 Agreement also provides for no payment after termination of an assignment after a complaint by a

4

Client.  (*Id*.)  There is no discussion in the 2017 Agreement about timing of payment.  (*Id*.)

**C.  Discipline**

The Guide provides a three "Level" policy for disciplining a Meeting Manager if a Client complains.  (Dkt. 28-2, § XI.)  At the first Level, Plannernet blocks the Meeting Manager from further assignments with the same Client; at the second Level, Plannernet allows the Meeting Manager access only to lower level assignments; and at the third Level, Plannernet terminates the Agreement.  (*Id*.)

**D.  Reimbursement of Expenses**

The Version 4.0 Agreement provides for reimbursement of expenses of "ordinary and necessary travel expenses" but also states that the terms and conditions of expense reimbursement are set by the specific assignment.  (Dkt. 28-4, ¶5.)  There is no discussion of reimbursement in the 2017 Agreement.  (Dkt. 33-1.)

**E.  Provision of Supplies and Equipment**

The 2017 Agreement provides that each Meeting Manager must "provide its own equipment, tools, other materials, and other requirements at its own expense, including . . . [a] PC, laptop, telephone, office supplies, and services for voice and data transmission."  (Dkt. 33-1, ¶ 5.)  The Version 4.0 Agreement and Guide are silent on this issue.

**F.  Professional Standards**

The Version 4.0 Agreement provides that Meeting Managers also agree to meet the "highest professional standards" including those set by the Client for a specific assignment.  (Dkt. 28-4, ¶ 6.)  The Guide discusses the Client's expectations.  (Dkt. 28-2, § VII.)  The 2017 Agreement does not contain this provision but rather states that the Meeting Manager shall perform "Services competently consistent with industry standards and shall use its expertise and creative talents in providing the Services."  (Dkt. 33-1, ¶ 5.)

**G.  Direct Dealing with Clients**

The Version 4.0 Agreement provides that Meeting Managers may not deal directly with Clients and must refrain from direct employment with a Client for at least a year after termination of the Agreement.  (Dkt. 28-4, ¶ 7.)  Like the Version 4.0 Agreement, the Guide provides that

United States District Court
Northern District of California

5

there shall be no direct dealing or contact with Plannernet's Clients outside the services the Meeting Manager directly provides.  (Dkt. 28-2, § VII.)  The 2017 Agreement provides a similar provision with some modifications in a section titled "Non-Solicitation."  (Dkt. 33-1, ¶ 8.)  For example, the 2017 Agreement provides that the section does not apply in California.  (*Id*.)

### H. Termination

The term of the Version 4.0 Agreement is one year, subject to renewal for "successive annual terms" unless a party gave notice of termination.  (Dkt. 28-4, ¶ 9.)  Either party can terminate the Agreement at any time by providing written notice.  (*Id.*)  The termination is effective immediately upon receipt.  (*Id.*)  The Guide states that "Plannernet or meeting manager may terminate the [Independent Contractor Agreement] relationship at any time with written notice to the other party."  (Dkt. 28-2.)  The 2017 Agreement sets a specific date by which it expires but also provides:  "Either party is entitled to terminate this Agreement at any time upon written notice given to the other[.]"  (Dkt. 33-1, ¶ 9.)

### I. Assignment of Duties

The Version 4.0 Agreement also states that the Meeting Manager "shall not assign any part of his or her rights or duties" without "prior express written consent of Plannernet" and that the Meeting Manager "shall not substitute another meeting manager" without "Plannernet's express approval."  (Dkt. 28-4, ¶ 18.)  The 2017 Agreement states that the Meeting Manager "shall not subcontract or otherwise delegate its obligations under this Agreement and shall not substitute another [Meeting Manager] on any [Statement of Work] without Plannernet's prior written consent."  (Dkt. 33-1, ¶ 5.)

### J. Meals

Under the Guide, Meeting Managers "are prohibited from eating a meal on the client's bill or taking a to-go box at any event." (Dkt. 28-2, § VII.)  The Guide instructs Meeting Managers to take the necessary precautions for any program by eating before going onsite or by bringing a snack. (*Id.*)   The Guide also states that "eating during an event is not appropriate management of the event, nor is it an appropriate representation of our services to the client."  (*Id.*)  The Guide instructs Meeting Managers to use "tactful discretion" when turning down the host who offers a

United States District Court
Northern District of California

1    meal onsite to "maintain professional standards and expectations." (*Id.*)

2        **K.  Review of Meeting Managers' Initial Application**

3        After signing the Agreement and acknowledgement of the Guide, and paying a mandatory

4    $50 application fee, Plannernet reviews applicants' qualifications to determine if the applicant has

5    the experience to be a Meeting Manager.  (Dkts. 28-2, p. 2; 33, pp. 4-5; 33-4, ¶ 7.)  The Guide

6    states that, to be eligible to become a Meeting Manager, a person must have a minimum of five

7    years of onsite meeting management experience, one year of verifiable onsite meeting

8    management or registrar experience for a junior planner network, a secondary education or

9    continuing education in meeting management or hospitality-related studies, and insurance

10   coverage.  (Dkt. 28-2, § V.)  As of July or August 2016, Plannernet imposed a requirement that

11   Meeting Managers become a business entity other than a sole proprietor, e.g., a limited liability

12   company.  (Dkt. 34-2: 32:22-33:15.)

13       **L.  Acceptance of Assignments**

14       Upon approval, Meeting Managers receive a personal identification number to obtain

15   access to the "Engagement Board" or "job board" which contains lists of clients who require

16   services, a summary description of the client event, the proposed compensation (negotiable

17   between the Meeting Manager and the Client), the location, and any pertinent information.  (Dkt.

18   33, p. 5.)  Meeting Managers then review the specific assignments and choose any assignment on

19   a "first come, first served" basis.  (Dkts. 33-1, ¶¶ 4-5; 33-2, ¶¶ 4-5; 33-3, ¶¶ 4-5; 33-6, ¶¶ 4-5; 33-

20   7, ¶¶ 4-5.)  Meeting Managers accept a position by simply clicking the "AGREE" button. (Dkt.

21   28-2*,* § VI.)  Meeting Managers are allowed to negotiate with Clients for a higher price.  (Dkts.

22   33-1, ¶ 18; 33-2, ¶ 19, 33-3, ¶19.)

23       The 2017 Agreement provides that Meeting Managers are free to work with companies

24   other than Plannernet to provide similar services, as long as they do not violate the Agreement's

25   prohibition on soliciting Clients.  (Dkt. 33-1, ¶ 7.)   The Version 4.0 Agreement and Guide are

26   silent on this issue, but other Meeting Managers who began their contractual relationships with

27   Plannernet as far back as 2007 and 2008 stated that they were free to work for other companies

28   even while in a contractual relationship with Plannernet.  (Dkts. 33-1, ¶¶ 8, 13; 33-2, ¶¶ 8, 13; 33-

United States District Court
Northern District of California

3, ¶¶ 3, 13; 33-6, ¶¶ 8, 14; 33-7, ¶¶ 7, 12.)  Plaintiff also worked as an employee for another company and as an independent contractor for a third company, while she was working with Plannernet.  (Dkt. 33-5, 28: 15 – 25, 66: 8 - 19.)  Plaintiff was free to work with entities unrelated to Plannernet the entire time she worked with Plannernet.  (*Id*. at 154:  5 – 11.)  Meeting Managers had complete control to choose assignments and could work as little or as much as they wanted to work.  (Dkt. 33-4, ¶ 15.)

**PROPOSED CLASS**

Plaintiff proposes the following class of non-exempt workers employed by Defendant:

> All persons employed by Defendant in California at any time during the four years preceding the filing of this Complaint through to the present to provide, on a temporary basis, attendee services at client events with 50 attendees or more, wherein the class members' work consisted of any of the following duties or some combination thereof: registering guests arriving at events, distribution and collection of event-related materials (including but not limited to surveys, evaluations, pamphlets, Q&A cards, gifts, promotional material, vouchers, badges, Audience Response System keypads), checking guest credentials, filling gift bags, scanning attendee badges, acting as "wayfinders" or "directional," assisting guests on and off buses or other transportation, providing event materials to attendees, setting up or tearing down booths, setting up or tearing down registration areas, door/room monitoring, or assisting attendees at "information desks."

(Complaint at Dkt. 1, ¶ 28; Dkt. 28-1, p.3.)

**ANALYSIS**

**A.** **Legal Standard**

To succeed on this motion for class certification, Plaintiff must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a), and the requirements for certification under one of the subsections of Rule 23(b).  *Mazza v. Am Honda Motor Co.,* 666 F.3d 581, 588 (9th Cir. 2012).  This analysis does not focus on the probable outcome on the merits.  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,* - U.S. -, 133 S.Ct. 1184, 1194-95 (2013).  "Merits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195 (citation omitted).

//

Rule 23(a) provides that a case is appropriate for certification as a class if

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P.23(a).  "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions in Rule 23(b)." *Comcast v. Behrend,* 569 U.S. 27, 133 S.Ct. 1426, 1432 (2013) (internal quotation marks, citations and emphasis omitted).

Plaintiff in this action contends that the putative class satisfies Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual  members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.R.Civ.P. 23(b)(3).

**B.    Plaintiff Has Satisfied Rule 23(a)**

**1.    Numerosity (Rule 23(a)(1))**

Plaintiff satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable."  Fed.R.Civ.P. 23(a)(1).  Numerosity refers to the "difficulty or inconvenience of joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913-14 (9th Cir. 1964).  The requirement is not tied to any fixed numerical threshold, but courts have found the numerosity requirement satisfied when the class comprises forty or more members.  *Villalpando v. Exel Direct, Inc.,* 303 F.R.D. 588, at *605-06, (N.D. Cal. 2014).  *See also Jordan v. County of Los Angeles,* 669 F.2d 1311, 1319 (9th Cir.1982), *vacated on other grounds,* 459 U.S. 810 (1982) (classes of even fewer than 100 qualify).  Plaintiff estimates that there were 190 putative class members in California during the relevant legal period.  Defendant does not dispute this contention.  Therefore, Plaintiff has established that the proposed

class is sufficiently numerous.  Plaintiff has satisfied Rule 23(a)(1).

### 2.    Commonality (Rule 23(a)(2))

"Commonality requires that the class members' claims 'depend on a common contention that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'" *Mazza,* 666 F.3d at 588-89 (quoting *Wal-Mart Stores v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 2551 (2011).  "[C]ommonality requires a single significant question of law or fact."  *Id.* at 589. The "preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)."  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998). It is sufficient for the plaintiff to demonstrate "shared legal issues with divergent factual predicates, as is a common core of salient facts couple with disparate legal remedies within the class."  *Id.*

Here, the commonality requirement is satisfied because the question of whether Plannernet misclassified the Meeting Managers as independent contractors under California law is a common question that is capable of common resolution for the class based on the Agreements that all putative class members signed.  *Soares v. Flower Foods, Inc.,* 320 F.R.D. 464, 477 (N.D. Cal. 2017); *Villalpando,* 303 F.R.D. at 606; *Norris-Wilson v. Delta-T Group, Inc.,* 270 F.R.D. 596, 604 (S.D. Cal. 2010).  Plannernet contends that commonality is problematic because each Meeting Manager's relationship with Plannernet was different from other's relationships with Plannernet, since there has never been a "uniform job description."  (Dkt. 33, p. 8.)  However, Plannernet acknowledges that, after a Meeting Manager is invited to join Plannernet, the Meeting Manager enters into the Agreement.  (*Id.,* p. 5.)  Further, differences in the way jobs were performed do not show lack of conformity, since the vagueness of the relationships stemmed from the common Agreements.  *See Soares,* 320 F.R.D. at 477.  Plaintiff has satisfied Rule 23(a)(2).

### 3.    Typicality (Rule 23(a)(3))

Typicality requires consideration of "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether the other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992).  "Typicality refers to the nature of the

United States District Court
Northern District of California

10

claim or defense of the class representative and not facts surrounding the claim or defense." *Id.* Typicality and commonality both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes,* 131 S.Ct. at 2551, n. 5.

Where a misclassification stems from a single corporate policy, the named plaintiff's claims are typical. *Soares,* 320 F.R.D. at 475 (citing *Smith v. Cardinal Logistics Mgmt. Corp.,* 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008)). Here, Plaintiff's claims are typical of the class because they arise out of the alleged misclassification of Meeting Managers as independent contractors under the Agreements with Plannernet. Plaintiff and the class members suffered a similar or common injury. Plaintiff has satisfied Rule 23(a)(3).

### 4.     Adequacy of Representation (Rule 23(a)(4))

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class," and Rule 23(a)(4) is satisfied if the proposed representative plaintiff does not have conflicts of interest with the proposed class and if the proposed class is represented by qualified and competent counsel. *Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 535 (N.D. Cal. 2012) (citation omitted).

Plannernet argues that Plaintiff's purported injury is the "antithesis to the class she purports to represent" because other putative class members "prefer the flexibility and freedom that their status as an independent contractor affords." (Dkt. 33, p. 20.) However, Plaintiff's action would not foreclose other putative class members' desire to remain independent contractors, because, even if the class is certified and proves that plaintiffs are employees, Plannernet could "still be free to hire independent contractors" to provide services to clients "provided that the arrangement complies with California law." *Soares,* 320 F.R.D. at 476; (citing *Smith,* 2008 WL 4156364, at *7).

Plannernet also attacks Plaintiff's credibility and asserts that Plaintiff's independent contractor relationship with other business entities, in which she provided similar services reveals "hypocrisy" and "demonstrates that she is an opportunist singling out Plannernet." (Dkt. 33, p.

United States District Court
Northern District of California

1    22.)  The Court disagrees.  Plaintiff's relationship with other entities is not at issue in this motion.

2    Further, upon review of the deposition testimony cited by Plannernet, the Court does not find any

3    basis for assaulting Plaintiff's credibility.  There is no testimony indicative of Plaintiff's lack of

4    forthrightness or dishonesty.

5         At oral argument, Plannernet argued that Plaintiff is not a suitable class representative

6    because she allegedly concedes that she was properly classified as an independent contractor for

7    all of the engagements with Clients other than one.  Since status as an employee is an "all or

8    nothing" proposition under California law, Plannernet argues that Plaintiff's confused belief about

9    her status as a partial employee and partial independent contractor makes her unsuitable as a class

10   representative.  However, the deposition testimony submitted here does not show that; instead,

11   Plaintiff concedes that she has damages only for one event.  (Dkt. 33-5.)  At oral argument,

12   Plaintiff responded that she is not a lawyer and that her position in this litigation is that she was an

13   employee of Plannernet.  Plaintiff's damages are limited to events where she actually incurred

14   damages for the claims asserted in this action.

15        Finally, the Court disagrees with Plannernet's contention that Plaintiff exhibited lack of

16   knowledge about the class claims.  (*Id.,* p. 21.)  The Court finds to the contrary.  Plaintiff was able

17   to respond competently to counsel's questioning during her deposition.  (Dkt. 33-5.)

18        Plaintiff's proposed class counsel provided information about qualifications to represent

19   the proposed class.  (Dkts. 28-2, 28-3.)  Plannernet does not oppose the qualifications.  Thus, the

20   Court finds that proposed class counsel is competent to represent the proposed class.

21        The Court finds that Plaintiff has satisfied Rule 23(a)(4).

22   **C.    Rule 23(b)(3).**

23        Plaintiff contends that the putative class satisfies Rule 23(b)(3), which requires the Court

24   to find that: "[1] the questions of law or fact common to class members predominate over any

25   questions affecting only individual members, and [2] a class action is superior to other available

26   methods for fairly and efficiently adjudicating the controversy."

27   //

28   //

12

**1.      Whether Common questions of law or fact predominate.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon,* 150 F.3d at 1022.  Where common questions can be resolved for all members of the case in a single adjudication, there is "clear justification for handling the dispute on a representative rather than an individual basis." *Id.*  Rule 23(a)(2) requires only the determination of a common issue.  However, the predominance inquiry considers both the common and individual issues and weighs them against each other.  *See Dukes,* 131 S.Ct. at 2556.  "Considering whether 'questions of law or fact common to class members predominate' begins, of course with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 809 (2011).

Under California law, once an individual proves that she provided services to the employer, she has established a *prima facie* case of employer-employer relationship and the burden shifts to the putative employer to prove that the presumed employee was an independent contractor.  *Narayan v. EGL, Inc.,* 616 F.3d 895, 900 (9th Cir. 2010) [*Narayan I*].  "Because the California Labor Code does not define 'employee,' courts generally apply the common law test to distinguish between employees and independent contractors." *Bowerman v. Field Asset Services, Inc.,* 242 F.Supp.3d 910, 928-29 (N.D. Cal. 2017).

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S.G. Borello & Sons, Inc. v. Dept. of Industrial Relations,* 48 Cal.3d 341, 350 (1989).  The key is determining whether the hirer "retains all necessary control" over the operations, particularly whether the hirer can discharge the worker without cause.  *Id.* at 357.  "[T]he fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision or control." *Ayala v. Antelope Valley Newspapers, Inc.,* 59 Cal.4th 522, 531 (2014).  With regard to the right to control, courts have found that workers are independent contractors if they follow "the employer's desires only in the result of the work, and not the means by which it is achieved." *Ali v. U.S.A. Cab Ltd*., 176 Cal.App.4th 1333, 1347 (2009).

United States District Court
Northern District of California

Another factor in determining an employee relationship is whether the hirer can discharge the worker at will, without cause. *Borello*, 48 Cal.3d at 350 (internal citation omitted). Other courts have couched this factor as the "strongest factor" in determining the right to control the worker, because the hirer can control the worker's actions by the threat to terminate the relationship. *Ayala*, 59 Cal.4th at 531(internal citations and quotations omitted).

California courts also consider "several 'secondary' indicia of the nature of a service relationship" for the purposes of a common law employment relationship. *Borello,* 48 Cal.3d at 350. These are the following factors:

(a) "whether one performing services is engaged in a distinct occupation or business,"

(b) "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision,"

(c) "the skill required in the particular occupation,"

(d) "whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work,"

(e) "the length of time for which the services are to be performed,"

(f) "the method of payment, whether by the time or by the job,"

(g) "whether or not the work is a part of the regular business of the principal," and

(h) "whether or not the parties believe they are creating the relationship of employer-employee."

*Id.* at 351. In addition, there are other factors, some overlapping with the factors described above, from other jurisdictions, that the California Supreme Court considered in *Borello*:

(1) "the alleged employee's opportunity for profit or loss depending on his managerial skill,"

(2) "the alleged employee's investment in equipment and materials required for his task or his employment of helpers,"

(3) "whether the service rendered requires a special skill,"

(4) "the degree of permanence of the working relationship," and

(5) "whether the service rendered is an integral part of the alleged employers' business." *Id.* at 355.  The factors listed above are not separate tests to be applied mechanically, but rather "are intertwined and their weight depends often on the particular combinations." *Id.* at 351.  In deciding a motion for class certification, "the issue is whether these factors may be applied on a class-wide basis, generating a class-wide answer on the issue of employee status, or whether the determination requires too much individualized analysis." *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012) [*Narayan II*].  As the California Supreme Court described, the test is whether there are "elements necessary to establish liability" that are "susceptible to common proof, or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence." *Ayala*, 59 Cal.4th at 533.   In other words, the issue is not whether the defendant has strong arguments showing that the worker is an independent contractor but whether the Court can make a decision for the class based on common factors.

### a.  Right to Control

The California Supreme Court explained that the issue is "not how much control a hirer *exercises* but how much control the hirer retains the *right* to exercise." *Id.* (emphasis in original). Here, the right to control is discussed in three main documents – the Version 4.0 Agreement, the 2017 Agreement, and the Guide.  Plannernet makes a persuasive argument that the Meeting Managers are not employees because Plannernet cedes the right to control the specific activities of the Meeting Managers to the Clients.  Plannernet then argues that, to determine the right to control, the Court would be required to review each individual assignment to determine how much control the Clients exerted.  However, Plannernet confuses the issue of *right* to control with the *exercise* of control.  Here, the Court can determine, based on the Agreements and Guide, whether Plannernet had the *right* to control the Meeting Managers, or whether Plannernet did in fact give up control such that the Meeting Managers were independent contractors.  There is no need for individualized analysis, as all agree that the Agreements and Guide dictated the terms of control, if any, that Plannernet had over the Meeting Managers.

For example, one issue of control is how assignments are made.  There is no dispute that the Meeting Managers could choose the assignments when they wanted to work and that they

United States District Court
Northern District of California

1   chose the times and locations for the assignments based on availability on the Engagement Board.

2   These policies were consistent for all Meeting Managers, so this is well suited for class-wide

3   determination.

4       Another issue of right to control is spelled out in the Guide:  rules about behavior.  The

5   Guide provides the standards regarding dress, professional conduct such as chewing gum, eating,

6   drinking, or taking personal phone calls, while on site.  The Version 4.0 Agreement also discusses

7   the professional standards in the Guide generally.  These requirements are all contractual, and as

8   one court explained, "the point is that they are all the same" for the putative class members.

9   *Soares v. Flowers Foods, Inc.,* 320 F.R.D. at 480.

10       Other courts have reviewed the right to control also in the context of whether the worker

11   can work with other companies.  *Ali,* 176 Cal.App.4th at 1349.  Here, there appears to be no

12   dispute that Plannernet had a general policy of allowing the Meeting Managers to work for other

13   companies.   Only the 2017 Agreement specifically mentions this, but Plaintiff does not dispute

14   Plannernet's contention that this was a class-wide policy even before that time.  For example,

15   Plaintiff worked with other companies during the time she was a Meeting Manager with

16   Plannernet.

17       Another issue regarding the right to control is the right to set pay.  Independent contractors

18   can negotiate their pay.  *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101 (9th Cir. 2014).

19   Here, the Meeting Managers can review the assignments on the Engagement Board and pick and

20   choose, and sometimes even negotiate with the posting Client.

21       Thus, the issue of Plannernet's right to control the Meeting Managers is well-suited for

22   class-wide determination.

23   **b.  Right to Discharge**

24       The right to discharge without cause is determined by class-wide documents.  As noted

25   above, the Version 4.0 Agreement, the 2017 Agreement, and the Guide all provide Plannernet the

26   ability to terminate the relationship with the Meeting Manager without cause.  Thus, this issue can

27   be decided on a class-wide basis.

28   //

### c.  Distinct Occupation or Business/Opportunity for Profit and Loss/Hiring Others

Whether the Meeting Managers are operating a distinct occupation or business can be decided on a class-wide basis.  The test is whether the workers are "wholly integrated" into the hirer's business.  *Alexander v. FedEx Ground Pkg. Syst., Inc*, 765, F.3d 981, 995 (9th Cir. 2014).  One way to determine if the Meeting Managers ran distinct occupations or businesses is to examine their ability to hire subcontractors.  *Soares*, 320 F.R.D. at 483 (citations omitted); *Narayan II,* 285 F.R.D. at 475.  And because the Version 4.0 Agreement, 2017 Agreement, and Guide directly address the ability of the Meeting Managers to work with subcontractors or to substitute workers, this issue can be decided on a class-wide basis.

In addition, Plannernet argues that the Meeting Managers were treated as independent businesses because they are paid for cancellations, even if they do not work, pursuant to the terms of the Guide.  (Dkt. 28-2, § X.)  Plannernet also argues that, since many of the assignments were for fixed fees, the Meeting Managers could make a profit or loss depending on how efficiently they worked.  These issues are examined, as a practical matter, on a class-wide basis, either by reference to the Guide or to general information about Plannernet.

Plannernet argues that Meeting Managers have the right to make a profit or loss based on the terms of different assignments and the Meeting Managers' efficiency in carrying out the assignments.  There is again no dispute that this issue of the Meeting Managers' ability to do so is consistent for all Meeting Managers.

The issue of whether Meeting Managers could hire subcontractors is also addressed in the general documents, so this issue can be decided on a class-wide basis.

### d.  Skill Required in the Particular Occupation

The issue here is whether the Meeting Managers require a certain amount of skill to work with Plannernet.  Again, Plannernet sets a general standard for choosing the Meeting Managers who have a minimum degree of competence in staffing events.  (Dkt. 33-4, ¶ 7.)  Plannernet in general sought Meeting Managers with "prior verifiable meeting management experience, secondary education, or continuing education in meeting management."  (*Id*.)  Thus, this issue can be decided on a class-wide basis, because the standard is class-wide.

### e.   Instrumentalities, Tools, and the Place of Work

The question of whether Plannernet has a policy of requiring Meeting Managers to provide their own tools and instrumentalities is also consistent across the group of Meeting Managers. Plaintiff claims, with no citation to evidence, that Plannernet supplied the necessary materials for the job.  (Dkt. 28-1 at 12.)   Plannernet disagrees.  (Dkt. 33-4, ¶ 17.)  The 2017 Agreement addresses this issue specifically.  Thus, this can be determined on a class-wide basis at least for Meeting Managers who signed the 2017 Agreement.  However, there might be some individualized assessments for other Meeting Managers who signed the Version 4.0 Agreement.

### f.   Length of Time for Services/Degree of Permanence of Relationship

Plannernet argues that this factor requires individualized analysis, since each assignment differs in length.  However, courts have analyzed this factor by looking at the length of the relationship between the putative employer and worker – not the individual assignment or shift. *See, e.g., O'Connor v. Uber,* 2015 WL 5138097, at* 26 (N.D. Cal. Sept. 1, 2015 (citations omitted).  As the Ninth Circuit found in *Alexander*, a contractual agreement lasting for a term from one to three years with provisions for renewal favors a finding of employment status.  765 F.3d at 996.  Here, the Version 4.0 Agreement is for one year with renewal, and the 2017 Agreement sets a specific date at least one year from the time of signing.  (Dkts. 33-1, 33-2, 33-3, 33-7.) This issue can be determined by looking to the Version 4.0 Agreement and the 2017 Agreement on a class-wide basis.

### g.   Method of Payment, by Time or by Job

This factor requires individualized analysis, since each assignment differed in payment method.  The Clients determined whether to pay hourly or in a set amount for a project.  Plaintiff claims that larger meetings generally pay by the hour (Dkt. 28-1), but cites no evidence.  Plaintiff explains that the proposed class, which is comprised of Meeting Managers who worked for conferences with 50 or more attendees, was designed to capture the group of Meeting Managers who were paid by the hour.  There is no evidence that size of the conference or meeting dictated the form of payment, and thus, even if the Class is limited to Meeting Managers who worked at conferences of more than 50 people, this analysis will require individualized assessments.

### h.  Work as Part of the Regular Business of the Principal

This factor, like the factor discussing the distinct occupation or business, can be determined by looking at the general work of Plannernet and the type of work that the Meeting Managers provide.  Plannernet argues that this is not susceptible to a class-wide determination because each assignment for a Client differs, and the Court will be required to review each assignment separately.  However, Plannernet provides a general description of the types of services offered by Meeting Managers to Clients. (Dkt. 33-4, ¶ 3; Dkt. 28-2, § I.)  Each Client might ask for a different subset of duties, but they choose from a set menu.  (Dkt. 33-44, ¶ 4.)  Given that the Meeting Managers were providing a generalized set of services, the Court can review Plannernet's business and determine whether the Meeting Managers' work was essential to the business of Plannernet.

### i.  Parties' Beliefs about Relationship

This factor, whether the parties believe that they are creating an employer-employee relationship, by definition, requires individualized assessment.  It is difficult to imagine a situation in which any Court could make this determination for a class of workers on a class-wide basis.  Although this factor is individual in nature, this factor also has the least weight.  *O'Connor*, 2015 WL 5138097, at *28; *Ayala*, 59 Cal.4th at 539; *Borello*, 48 Cal. 3d at 349.  The trier of fact is the ultimate arbiter of this factor, based on objective evidence.

Plannernet argues that Plaintiff believed that she was an independent contractor for all engagements except for the assignment for NVidia, where she was an employee.  Plannernet argues that, given that the employment relationship is an "all or nothing" proposition and that a job cannot be split between status as an independent contractor and employee, Plaintiff's belief is especially harmful to this factor.  Plaintiff at oral argument maintained that she was an employee.  The Court accepts Plaintiff's statement of belief that she was an employee of Plannernet.

### j.  Conclusion

Overall, the most important factors – the right to control the Meeting Managers and the ability to fire without cause – can be determined by reference to the same documents for all Meeting Managers.  And looking at the additional *Borello* factors, again the vast majority of them

19

1    can be decided on a class-wide basis.

2         **2.      Whether Claims are Suited for Class-wide Treatment**

3         Plaintiff argues that the types of claims – failure to pay overtime wages, failure to provide

4    meal and rest breaks, failure to reimburse expenses, failure to pay all wages, and failure to provide

5    wage statements  – are well suited for class treatment.  Plannernet argues that the analysis of these

6    claims will require individualized assessments poorly suited for treatment on a class basis.  As a

7    general matter, courts have noted that individual differences in damages do not require a court to

8    deny a motion for class certification.  *Levya v. Medline Industries, Inc*., 716 F.3d 50, 513-514 (9th

9    Cir. 2013).  These claims might require individualized assessments for damages, but the claims are

10   suitable for class-wide treatment.

11        **a.      Failure to Pay Overtime and Unpaid Wages**

12        Defendants argue that the evidence regarding this claim cannot be determined on a class-

13   wide basis because most Meeting Managers are paid on a fixed-fee basis and thus do not have any

14   records of hours worked.  This problem is not unique to this case, as workers who are classified as

15   independent contractors, even wrongfully, often do not keep records of the hours they work.

16   Courts have nonetheless certified classes based on this type of claim and used a variety of methods

17   to determine damages.  *Villalpando*, 303 F.R.D. at 609-610.  The fact that there are not clear

18   records is not a reason alone to deny certification.

19        **b.      Failure to Provide Meal and Rest Breaks**

20        Plannernet argues that this claim based on the failure to provide meal and rest breaks is not

21   suited for class certification because there is a disconnect between the written policy and reality.

22   Plaintiff concedes that there is a conflict between the written policy and actual practice in some

23   cases.  (Dkt. 28-1 at 14.)  The written policy in the Guide prohibits Meeting Managers from eating

24   "on the client's bill."  (Dkt. 28-2.)  This is a policy clearly in violation of the California Labor

25   Code for employees.  There is also no mention of rest breaks in the Guide.  Silence alone about

26   meal and rest breaks in a general set of rules for workers is sufficient to create a common issue for

27   class certification.  *Wang v. Chinese Daily News*, 2014 WL 1712180, *7 (C.D. Cal. April 15,

28   2014).  Given the express statement prohibiting meal breaks and the lack of statement about rest

United States District Court
Northern District of California

breaks, the Court finds that this claim is suitable for class-wide determination.

### c.     Failure to Provide Reimbursements for Expenses

Plaintiff bases her claim for failure to reimburse expenses on three different types of expenses:  (1) the mandatory $50 fee that Meeting Managers paid to become Meeting Managers with Plannernet, (2) parking fees, and (3) fees for use of personal cell phones. (Dkt. 28-1 at 15.)

There is no dispute that Plannernet requires all Meeting Managers to pay the $50 fee, so this issue can easily be determined on a class-wide basis if there is a determination that Meeting Managers are employees.

In contrast, the issue of failure to reimburse expenses for parking fees and cell phones is not suitable for class-wide determination.  Section 2802 of the California Labor Code provides that an "employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties[.]"  Because each assignment differed slightly in terms of requirements, it is not possible to determine on a class-wide basis if a Meeting Manager had "necessary" parking fees or "necessary" fees for cell phone for assignments.  In addition, although the official written policy – the Guide – sets forth the terms of reimbursement, Meeting Managers cans negotiate directly with the Client for reimbursement of certain types of expenses, including expenses that the Guide did not reimburse. (Dkt. 33 at 18; Dkts. 33-5 at 213: 7- 19, 214: 3 – 17; Dkt. 33-2, ¶ 19; Dkt.33-1, ¶ 19; Dkt. 33-6, ¶ 19; Dkt. 33-5 at 214: 3 – 17.)  This alone might simply be a problem for calculating damages and not a reason for refusing to certify a class, but combined with the fact that each assignment and thus the needs for parking and cell phones differ from assignment to assignment, the issue of reimbursement for these two expenses is not suitable for class certification.  Therefore, the claim for failure to reimburse expenses for parking and cell phones is excluded from this claim.  Only the claim for failure to reimburse the $50 application fee is suitable for class-wide determination.

### d.  Other Claims

Plannernet has no real objection to the other claims alleged by the Plaintiff other than the general ones directed to the ability to determine employment on a class-wide basis, and there is no obvious reason why these additional claims cannot be adjudicated on a class-wide basis.

**CONCLUSION**

For these reasons, the motion to certify the class as defined is GRANTED with the modification for the claim under Cal. Labor Code § 2802 above.  Because the Version 4.0 Agreement and 2017 Agreement differ on some of the issues regarding the potential employment status of the Meeting Managers, there is a possibility that the Court will create a sub-class of plaintiffs:  (1) one class of Meeting Managers who signed an Agreement substantially similar to or identical to the Version 4.0 Agreement, and (2) another class of Meeting Managers who signed an Agreement substantially similar to or identical to the 2017 Agreement.  However, the Court defers that possibility until a later date.

**IT IS SO ORDERED**.

Dated: February 16, 2018



_____

SALLIE KIM
United States Magistrate Judge