# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA CHAMPAGNE,<br><br>Plaintiff,<br><br>v.<br><br>PLANNERNET, INC.,<br><br>Defendant. | Case No. 17-cv-02128-SK<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL**<br><br>Regarding Docket Nos. 72, 76 |

On March 1, 2019, Plaintiff Linda Champagne, on behalf of herself and all others similarly situated ("Plaintiff"), filed a motion for preliminary approval of a class action settlement in this matter. (Dkt. 72.) Defendant Plannernet, Inc. ("Plannernet") filed its statement of non-opposition to preliminary approval of the settlement on March 15, 2019. (Dkt. 76.) The Court has considered the submissions of the parties and had the benefit of oral argument on April 8, 2019. For the reasons set forth below, the Court hereby grants Plaintiff's motion for preliminary approval of the class action settlement, subject to the requirements addressed in this Order.

## BACKGROUND

Plannernet acts as a temporary staffing agency that provides its corporate clients with support staff for seminars, conferences, and trade shows at events in California and throughout the United States. (Dkt. 28-1, p. 1.) According to its mission statement, Plannernet strives "to be the premier provider of meeting management and support for professional meetings and events." (Dkt. 28-2, § II.) Plannernet supplies its clients, *e.g.*, meeting and incentive companies, travel companies, medical education companies ("Clients"), with meeting and event service providers. (Dkt. 33, p. 4.) Plannernet enters into client service agreements with its Clients, providing access to event staffing in exchange for a fee. (Dkt. 28-1, ¶ 4.) Plannernet's event service providers are referred to as "suppliers," "meeting managers," or "vendors" (referred to here as "Meeting

Managers"). Named Plaintiff Linda Champagne ("Plaintiff" or "Champagne") was a Meeting Manager for Plannernet, and she seeks to represent a class of similarly situated Meeting Managers.

Meeting Managers must sign the Plannernet Independent Contractor Agreement ("Agreement"). The parties submitted two versions of the Agreement: a version dated 2011 and labeled "Version 4.0" which is the version signed by Plaintiff in 2014, and a version dated October 2017 and signed by other Meeting Managers beginning around 2017. (Dkts. 28-4, 33-1, 33-2, 33-3, 33-6, 33-7.)[1] Meeting Managers also signed a document stating that they had received and read the Plannernet Meeting Manager Reference Guide ("Guide"). (Dkts. 28-2; 28-4.) When Plaintiff signed on with Plannernet, she signed a document titled: "Plannernet Meeting Manager Reference Guide Version 4.0 Acknowledgement Form." (Dkt. 28-4.) The Guide states:

> This handbook is intended to provide our meeting managers with general information and is not intended to create any contractual rights or obligations of any kind. All meeting managers will be given a copy of this guide and will be asked to acknowledge, in writing, that they have received and read the guide in its entirety[.]

(Dkt. 28-2.) The Guide states that Plannernet reserves the right to change the terms or rescind the Guide at any time. (*Id.*)

**A. Terms of the Agreements - Independent Contractor Status.**

Both the Version 4.0 Agreement and 2017 Agreement claim to be contracts with independent contractors. (Dkts. 28-4, ¶¶ 1, 10; 33-1, ¶ 4.) The 2017 Agreement provides that the Meeting Manager is working through a "valid business entity" but the Version 4.0 Agreement does not contain this provision. (*Id.*) The 2017 Agreement requires that the Meeting Manager have "all applicable insurance" to run the business, and the Guide requires that Meeting Managers have insurance. (Dkts. 33-1 at ¶ 1; 28-2 at §V.) Plannernet does not provide any guidance to the Meeting Managers "as to how to perform client engagements." (Dkt. 33-4, ¶ 19.)

**B. Payment.**

As to payment, the Version 4.0 Agreement provides that "[p]artial or full payment can be withheld from any assignment that does not meet the terms and conditions of the agreement

---

[1] As these are identical, the reference here will be to Dkt. 33-1.

2

(which included the terms and conditions of the specific assignment) or the Guide. (Dkt. 28-4, ¶ 4.) Further, compensation may be withheld from the Meeting Manager if the services rendered do not meet the terms of the Agreement, the specific assignment duties, or of the terms of the Guide. (*Id.*)

The Guide provides 60 days to process Meeting Managers' fees and allows Plannernet to withhold payment where "the Plannernet Quality Service Committee determines that specific action by a Meeting Manager has jeopardized the integrity of the program or the relationship with a Client." (Dkt. 28-2, § IX.) The Guide also states that "Plannernet attempts to compensate our meeting manager for reserving time out of their [sic] schedule" when Clients cancel. (Dkt. 28-2, § X.)

The 2017 Agreement provides that Plannernet "shall pay [Meeting Manager] the fees set forth in each [Statement of Work]" and that, unless otherwise specified, "no partial payments will be required for partial, incomplete or non-conforming Services." (Dkt. 33-1, ¶ 3.) The 2017 Agreement also provides for no payment after termination of an assignment after a complaint by a Client. (*Id.*) There is no discussion in the 2017 Agreement about timing of payment. (*Id.*)

**C.  Discipline.**

The Guide provides a three "Level" policy for disciplining a Meeting Manager if a Client complains. (Dkt. 28-2, § XI.) At the first Level, Plannernet blocks the Meeting Manager from further assignments with the same Client; at the second Level, Plannernet allows the Meeting Manager access only to lower level assignments; and at the third Level, Plannernet terminates the Agreement. (*Id.*)

**D.  Reimbursement of Expenses.**

The Version 4.0 Agreement provides for reimbursement of expenses of "ordinary and necessary travel expenses" but also states that the terms and conditions of expense reimbursement are set by the specific assignment. (Dkt. 28-4, ¶5.) There is no discussion of reimbursement in the 2017 Agreement. (Dkt. 33-1.)

**E.  Provision of Supplies and Equipment.**

The 2017 Agreement provides that each Meeting Manager must "provide its own

3

1 equipment, tools, other materials, and other requirements at its own expense, including . . . [a] PC,

2 laptop, telephone, office supplies, and services for voice and data transmission." (Dkt. 33-1, ¶ 5.)

3 The Version 4.0 Agreement and Guide are silent on this issue.

**F.  Professional Standards.**

The Version 4.0 Agreement provides that Meeting Managers also agree to meet the "highest professional standards" including those set by the Client for a specific assignment. (Dkt. 28-4, ¶ 6.) The Guide discusses the Client's expectations. (Dkt. 28-2, § VII.) The 2017 Agreement does not contain this provision but rather states that the Meeting Manager shall perform "Services competently consistent with industry standards and shall use its expertise and creative talents in providing the Services." (Dkt. 33-1, ¶ 5.)

**G.  Direct Dealing with Clients.**

The Version 4.0 Agreement provides that Meeting Managers may not deal directly with Clients and must refrain from direct employment with a Client for at least a year after termination of the Agreement. (Dkt. 28-4, ¶ 7.) Like the Version 4.0 Agreement, the Guide provides that there shall be no direct dealing or contact with Plannernet's Clients outside the services the Meeting Manager directly provides. (Dkt. 28-2, § VII.) The 2017 Agreement provides a similar provision with some modifications in a section titled "Non-Solicitation." (Dkt. 33-1, ¶ 8.) For example, the 2017 Agreement provides that the section does not apply in California. (*Id.*)

**H.  Termination.**

The term of the Version 4.0 Agreement is one year, subject to renewal for "successive annual terms" unless a party gave notice of termination. (Dkt. 28-4, ¶ 9.) Either party can terminate the Agreement at any time by providing written notice. (*Id.*) The termination is effective immediately upon receipt. (*Id.*) The Guide states that "Plannernet or meeting manager may terminate the [Independent Contractor Agreement] relationship at any time with written notice to the other party." (Dkt. 28-2.) The 2017 Agreement sets a specific date by which it expires but also provides: "Either party is entitled to terminate this Agreement at any time upon written notice given to the other[.]" (Dkt. 33-1, ¶ 9.)

/ / /

## I. Assignment of Duties.

The Version 4.0 Agreement also states that the Meeting Manager "shall not assign any part of his or her rights or duties" without "prior express written consent of Plannernet" and that the Meeting Manager "shall not substitute another meeting manager" without "Plannernet's express approval." (Dkt. 28-4, ¶ 18.) The 2017 Agreement states that the Meeting Manager "shall not subcontract or otherwise delegate its obligations under this Agreement and shall not substitute another [Meeting Manager] on any [Statement of Work] without Plannernet's prior written consent." (Dkt. 33-1, ¶ 5.)

## J. Meals.

Under the Guide, Meeting Managers "are prohibited from eating a meal on the client's bill or taking a to-go box at any event." (Dkt. 28-2, § VII.) The Guide instructs Meeting Managers to take the necessary precautions for any program by eating before going onsite or by bringing a snack. (*Id.*) The Guide also states that "eating during an event is not appropriate management of the event, nor is it an appropriate representation of our services to the client." (*Id.*) The Guide instructs Meeting Managers to use "tactful discretion" when turning down the host who offers a meal onsite to "maintain professional standards and expectations." (*Id.*)

## K. Review of Meeting Managers' Initial Application.

After signing the Agreement and acknowledgement of the Guide, and paying a mandatory $50 application fee, Plannernet reviews applicants' qualifications to determine if the applicant has the experience to be a Meeting Manager. (Dkts. 28-2, p. 2; 33, pp. 4-5; 33-4, ¶ 7.) The Guide states that, to be eligible to become a Meeting Manager, a person must have a minimum of five years of onsite meeting management experience, one year of verifiable onsite meeting management or registrar experience for a junior planner network, a secondary education or continuing education in meeting management or hospitality-related studies, and insurance coverage. (Dkt. 28-2, § V.) As of July or August 2016, Plannernet imposed a requirement that Meeting Managers become a business entity other than a sole proprietor, e.g., a limited liability company. (Dkt. 34-2: 32:22-33:15.)

///

**L.      Acceptance of Assignments.**

Upon approval, Meeting Managers receive a personal identification number to obtain access to the "Engagement Board" or "job board" which contains lists of clients who require services, a summary description of the client event, the proposed compensation (negotiable between the Meeting Manager and the Client), the location, and any pertinent information. (Dkt. 33, p. 5.) Meeting Managers then review the specific assignments and choose any assignment on a "first come, first served" basis. (Dkts. 33-1, ¶¶ 4-5; 33-2, ¶¶ 4-5; 33-3, ¶¶ 4-5; 33-6, ¶¶ 4-5; 33-7, ¶¶ 4-5.) Meeting Managers accept a position by simply clicking the "AGREE" button. (Dkt. 28-2, § VI.) Meeting Managers are allowed to negotiate with Clients for a higher price. (Dkts. 33-1, ¶ 18; 33-2, ¶ 19, 33-3, ¶19.)

The 2017 Agreement provides that Meeting Managers are free to work with companies other than Plannernet to provide similar services, as long as they do not violate the Agreement's prohibition on soliciting Clients. (Dkt. 33-1, ¶ 7.) The Version 4.0 Agreement and Guide are silent on this issue, but other Meeting Managers who began their contractual relationships with Plannernet as far back as 2007 and 2008 stated that they were free to work for other companies even while in a contractual relationship with Plannernet. (Dkts. 33-1, ¶¶ 8, 13; 33-2, ¶¶ 8, 13; 33-3, ¶¶ 3, 13; 33-6, ¶¶ 8, 14; 33-7, ¶¶ 7, 12.) Plaintiff also worked as an employee for another company and as an independent contractor for a third company, while she was working with Plannernet. (Dkt. 33-5, 28: 15-25, 66: 8-19.) Plaintiff was free to work with entities unrelated to Plannernet the entire time she worked with Plannernet. (*Id*. at 154:5-11.) Meeting Managers had complete control to choose assignments and could work as little or as much as they wanted to work. (Dkt. 33-4, ¶ 15.)

**M.      Allegations.**

Plaintiff alleges that Plannernet misclassified her and her coworkers as independent contractors when they were employees. Plaintiff asserts, on behalf of herself and others similarly situated, the following claims: (1) failure to pay overtime wages pursuant to California Labor Code §§ 510, 1194, 1198; (2) failure to provide meal and rest breaks pursuant to California Labor Code §§ 226.7, 512; (3) failure to pay wages for all hours worked pursuant to California Labor

Code §§ 200, 201.3, 218.6, 1194, 1194.2, 1197; (4) failure to pay wages in a timely manner pursuant to California Labor Code §§ 201.3, 204; (5) failure to pay wages upon termination or resignation of employment pursuant to California Labor Code § 203; (6) failure to reimburse expenses incurred in employment pursuant to California Labor Code § 2802; (7) failure to provide accurate, itemized statements of wages pursuant to California Labor Code §§ 201, 201.3, 202, 203, 204 , 218.6; and (8) unfair business practices pursuant to California Bus. & Prof. Code §§ 17200 *et seq.* (Dkt. 81 at ¶¶ 30-71.) Plaintiff also demands recovery under the Private Attorneys General Act ("PAGA"), California Labor Code § 2698 *et seq.* (*Id.* at ¶¶ 72-76.)

**N.  Court's Prior Order Granting Class Certification.**

On January 4, 2018, Plaintiff filed a motion for class certification. (Dkt. 28.) Plaintiff proposed a class composed of all Meeting Managers who had worked any event in California with 50 or more attendees in their time with Plannernet. (Complaint at Dkt. 1, ¶ 28; Dkt. 28-1, p.3.)[2] On February 16, 2018, the Court granted Plaintiff's motion and certified a class of plaintiffs who had worked events in California through Plannernet with 50 or more attendees. (Dkt. 40.) The Court held that the proposed class satisfied the numerosity, typicality, commonality, and adequacy requirements of Rule 23(a). The Court also found that the putative class satisfied the predominance inquiry of Rule 23(b)(3) because the question of whether Plannernet controlled class member activities as an employer was common to the class, and would center on common facts and the construction of the same agreements. The Court likewise found that the types of claims at issue were suited for classwide treatment. Accordingly, the Court certified the proposed class of Meeting Managers who worked at events with 50 or more attendees.

---

[2] Plaintiff's proposed class included "All persons employed by Defendant in California at any time during the four years preceding the filing of this Complaint through to the present to provide, on a temporary basis, attendee services at client events with 50 attendees or more, wherein the class members' work consisted of any of the following duties or some combination thereof: registering guests arriving at events, distribution and collection of event-related materials (including but not limited to surveys, evaluations, pamphlets, Q&A cards, gifts, promotional material, vouchers, badges, Audience Response System keypads), checking guest credentials, filling gift bags, scanning attendee badges, acting as "wayfinders" or "directional," assisting guests on and off buses or other transportation, providing event materials to attendees, setting up or tearing down booths, setting up or tearing down registration areas, door/room monitoring, or assisting attendees at "information desks."

7

# ANALYSIS

**A.      Conditional Class Certification.**

The parties have informed the Court that they have reached a proposed settlement that includes both the initially certified class *and* Meeting Managers who worked at events with fewer than 50 attendees. They propose a new class including all Meeting Managers who provided on site meeting and event planning services at Plannernet's Clients' events in California during the class period. The parties stipulated to the filing of an amended complaint reflecting this new class definition, and the Court granted leave to file on March 7, 2019. (Dkts. 73, 75.) On April 9, 2019, Plaintiff filed her First Amended Complaint. (Dkt. 81.) In it, she proposes an amended class including:

> All persons who worked for Defendant Plannernet as Suppliers or Meeting Managers and supported Defendant's onsite client events in California at any time from April 17, 2013 through the date of the preliminary approval order, and who did not properly and timely opt out of the Settlement Class by requesting exclusion.

(Dkt. 81 at ¶ 28.) Plaintiff now seeks conditional certification of the expanded class proposed in the First Amended Complaint.

**1.      Legal Standard.**

To succeed on a motion for class certification, Plaintiff must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a), and the requirements for certification under one of the subsections of Rule 23(b). *Mazza v. Am Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). This analysis does not focus on the probable outcome on the merits. *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, - U.S. -, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195 (citation omitted).

Rule 23(a) provides that a case is appropriate for certification as a class if

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;

8

> (3) the claims or defenses of the representative parties are typical of
> the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a). "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions in Rule 23(b)." *Comcast v. Behrend,* 569 U.S. 27, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks, citations and emphasis omitted).

Plaintiff contends that the putative class satisfies Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 2. Analysis

In its February 16, 2018 order discussing certification of the initially proposed class, the Court conducted an extensive analysis of the facts of this case under Rule 23. (Dkt. 40.) The Court need not duplicate that analysis here, as the Court is convinced that the addition of Meeting Managers who worked only smaller events does not alter the analysis of class certification. The expanded definition of the class has increased the size of the proposed class from 190 to approximately 400 members, a figure which Defendant does not dispute. Because Plaintiff satisfied the numerosity requirement of Rule 23(a)(1) with the smaller class size previously proposed, the expanded class also satisfies the requirement. Similarly, as was true of the previously certified class, the expanded class meets the commonality requirement of Rule 23(a)(2) because the question of whether Plannernet misclassified the Meeting Managers as independent contractors under California law is a common question that is capable of common resolution for the class based on the Agreements that all putative class members signed. And at oral argument on April 8, 2019, Plaintiff confirmed that all members of the expanded class signed the same agreements.

Plaintiff's claims are also typical of the expanded proposed class for purposes of Rule

23(a)(3) because they arise out of the alleged misclassification of all Meeting Managers as independent contractors under the Agreements with Plannernet. The Court's analysis of Rule 23(a)(4) likewise does not change because Plaintiff's claims and interests align with those of the expanded class, despite potential differences in the scope of individual damages.

Similarly, the expansion of the proposed class does not alter the Court's analysis of the predominance requirement of Rule 23(b)(3). In its prior certification order, the Court conducted an extended analysis regarding the interplay of factors California courts consider in determining an employee's relationship to her employer. Many of those factors turn on the central question of whether Plannernet exerted control over class members. The question remains well suited to class determination if the class is expanded because, though the number of hours and the number of attendees at the events worked may differ among class members, the crucial factors in establishing Plannernet's control can be determined primarily by reference to the employment agreements that all Meeting Managers signed. Additionally, the resolution of each class member's claim will turn on similar facts, regardless of the exact number of hours worked or number of attendees at events staffed.

The claims at issue for the entire expanded class– failure to pay overtime wages, failure to provide meal and rest breaks, failure to reimburse expenses, failure to pay all wages, and failure to provide wage statements – are well suited for class treatment. As a general matter, courts have noted that individual differences in damages do not require a court to deny a motion for class certification. *Levya v. Medline Industries, Inc*., 716 F.3d 50, 513-514 (9th Cir. 2013). These claims might require individualized assessments for damages, but the claims are suitable for class-wide treatment because they raise issues common across the expanded class.

Because the expanded class still meets the requirements of Rules 23(a) and 23(b)(3), the court will conditionally certify the expanded class for settlement purposes.

**B.     Appointment of Class Counsel.**

The Court finds that Plaintiff's counsel is suitable counsel for the settlement class proposed in the First Amended Complaint. Pursuant to Federal Rule of Civil Procedure 23(g), a court that certifies a class must appoint class counsel, considering as it does so the work counsel has done in

identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, counsel's knowledge of applicable law, and the resources that counsel will commit to representing the class. The appointing court may also consider any other matter pertinent to counsel's ability to adequately represent the interests of the class, order potential class counsel to provide further information, and may make further orders in connection with the appointment, including regarding attorneys' fees. Counsel for the Plaintiff has aided in identifying and investigating potential class claims. Plaintiff's counsel also has extensive experience litigating wage and hour class actions under California law. (Dkt. 72-1.) Based on this experience, the Court is satisfied that Plaintiff's counsel is well-versed in the applicable law and procedure and well-positioned to adequately represent the interests of the class. The Court therefore appoints Plaintiff's counsel as class counsel for the conditionally certified class.

## C. Preliminary Approval of the Settlement.

Here, the Court already certified an initial proposed class. However, because the parties propose expanding the settlement class, the Court will apply the standard for preliminary approval that typically applies before the final class is certified. When parties reach an agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). A court must pay "heightened attention to the requirements of Rule 23." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "Such attention is of vital importance, for a court asked to certify a class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* If the court temporarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified and a final "fairness" hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a court typically considers the following factors: "(1) the strength of the plaintiff's

11

case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery contemplated and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members in the proposed settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

When "a settlement agreement is negotiated prior to formal class certification, consideration of these eight … factors alone is" insufficient. *Id.* In these cases, courts must show not only a comprehensive analysis of the above factors but also that the settlement did not result from collusion among the parties. *Id.* at 947. Because collusion "may not always be evident on the face of settlement, … [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel has allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* In *Bluetooth,* the court identified three such indications:

(1) when class counsel receives a disproportionate distribution of the settlement; or when the class receives no monetary distribution but counsel is amply rewarded;
(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement); and
(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* The Court cannot fully assess all of these fairness factors until after the final approval hearing; thus, "a full fairness analysis is unnecessary at this stage." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted).

Rather, "the settlement need only be potentially fair, as the Court will make a final determination of the adequacy at the hearing on Final Approval, after such time as any party has a chance to object and/or opt out." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 2286 (C.D. Cal. May 31, 2007). For now, "[p]reliminary approval of a settlement and notice to the class is

appropriate if [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval." *Cruz v. Sky Chefs, Inc.*, 2014 WL 2089938, at *7 (N.D. Cal. May 19, 2014) (quoting *In re Tableware Antitrust Litig.*, 284 F. Supp. 2d 1078, 1079 (N.D. Cal. Apr. 12, 2007).

### 1. Terms of the Proposed Settlement.

The parties have reached a proposed settlement agreement that includes the following essential terms. Within 20 days of preliminary approval, Plannernet will provide class counsel and the settlement administrator with a list of the most recent contact information for all class members. (Dkt. 72-2 at ¶ 11.) Notice of the settlement will be distributed to the class members, who will then have 60 days to object to their settlement amounts or opt out of the settlement entirely. (*Id.* at ¶ 15.) The Court will then hold a final approval hearing and decide class counsel's motions for attorneys' fees and the service award for the named plaintiff. (*Id.* at ¶ 18.) Plannernet will create a settlement fund in order to pay the following: settlement payments to the class members, attorneys' fees to class counsel, litigation costs and expenses, the settlement administrator's fee, a service award to the named Plaintiff, and PAGA claim penalties. (Dkt. 72-2 at ¶ 5(c).)

The fund will total $440,000, and Plannernet will pay it in two equal installments, with the second occurring one year after the first. (*Id.* at ¶ 8, 12(g).) Class counsel plans to bring a motion for their attorneys' fees, which they estimate at 30 percent of the total fund, or $132,000. (*Id.* at ¶ 5(a).) Class counsel further estimates that litigation fees and costs will total $7,900 and the settlement administrator's fee will total $15,000, and they will ask for a service award to the named Plaintiff of $8,500. (*Id.*) The PAGA claim will total $10,000, of which 75 percent will be paid to the Labor and Workforce Development Agency and 25 percent will be redistributed into the fund for the benefit of class members. (*Id.*). After every line item but the payments to class members is subtracted from the fund, the remainder will be distributed among the class *pro rata*, based on class counsel's estimation of each class member's damages. (*Id.* at ¶ 6.) Distributions

13

will be made automatically to all class members who have not opted out of or objected to the settlement during the 60 day period after the notice of settlement is distributed to the class. Plannernet denies liability and the settlement agreement releases it from liability for all claims. (Dkt. 72-2 at ¶ 3, 4, 23.) Unclaimed settlement payments will become null and void 180 days after the mailing date of the settlement check, and unclaimed payments or funds that would have been allocated to class members who opted out will be reallocated for *pro rata* distribution to the class. (*Id.* at ¶ 8(d).)

### 2. The Fairness Factors.

#### i. Serious, informed, noncollusive negotiations.

This factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at \*8 (N.D. Cal. Apr. 29, 2011). For the parties "to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta*, 243 F.R.D. at 396. As to pre-certification settlements, enough information must exist for the court to assess "the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement" in order to determine if it is fair and adequate. *Id.* at 397 (internal quotation omitted). The parties' engagement in mediation and discovery "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement." *Villegas*, 2012 WL 5878390, at \*6; *Harris*, 2011 WL 1627973 at \*8. The use of a mediator alone is not dispositive of whether the settlement is fair and reasonable; however, it is strong evidence of a noncollusive settlement. *Bluetooth*, 654 F.3d at 948; *Satchell v. Fed. Express Corp.*, 2007 WL 1114010, at \*4 (N.D. Cal. Apr. 13, 2007); *Harris*, 2011 WL 1627973, at \*8.

Here, the parties engaged in both formal and informal written discovery and exchanged several thousand pages of documents. (Dkt. 72-2 at p.4.) Attorneys for both sides have thoroughly investigated the parties' respective positions under California labor law. (*Id.* at p.4-5.) Discovery included a list of class members coupled with the events at which each Meeting Manager worked and their approximate length, from which Plaintiff's counsel estimated damages. (Dkt. 72 at p.22.) The parties also participated in an all-day mediation with an experienced

14

1  mediator and continued arm's length negotiations thereafter.  (*Id.*)  The mediator proposed the key

2  terms of the settlement agreement, and the parties ultimately agreed to those terms after months of

3  continued arms-length negotiations.  (Dkt. 72 at p.22-23.)  The parties entered into a written

4  memorandum memorializing their agreement and subsequently have worked together to formalize

5  and prepare the proposed settlement agreement.  (*Id.*)

Based on the information before the Court, the settlement appears to be the product of serious, informed, non-collusive negotiations, which weighs in favor of preliminary approval of settlement.

### ii. Lack of Obvious Deficiencies.

The court looks to the settlement agreement for any obvious deficiencies. *Harris*, 2011 WL 1627973, at *8. Evaluating the factors set out in *Bluetooth* on a preliminary basis, the Court concludes that there are no obvious deficiencies at this stage in the approval process. 654 F.3d at 947. *Bluetooth* instructs courts to look for disproportionate distributions to counsel, especially where there is no class distribution; a clear sailing agreement providing for payment of attorneys' fees separate from the class fund; and unclaimed funds reverting to the defendant. *Id.* Here, Plaintiff's counsel has asked for 30 percent of the settlement fund in attorneys' fees. Though this percentage is higher than the 25 percent settlement that is presumptively acceptable in class action cases brought in this district, that does not appear to be an obvious deficiency, particularly as the Court will make a separate determination as to appropriate attorneys' fees in conjunction with final approval of the settlement. There is no clear sailing agreement here, the settlement fund will primarily be used to settle class members' claims, and any excess will be redistributed to the class members *pro rata*, rather than reverting to the Defendant. The Court concludes that there are no substantive deficiencies precluding preliminary approval.

As a practical matter, the Court is concerned that the notice period of 60 days allows too brief a window for class members to receive the settlement notice, decide whether to object or opt out, and act on that decision. Accordingly, the Court ORDERS that Plaintiff shall extend the deadline for a class member to opt out of the settlement from 60 days to 90 days. At the hearing on the motion for preliminary approval, the parties agreed to make this change.

### iii. Lack of Preferential Treatment.

This factor requires a court to determine if the settlement provides preferential treatment to any class member. *Villegas*, 2012 WL 5878390, at *7. Under the proposed settlement agreement, each member of the class will be allocated a *pro rata* share of the fund based on class counsel's estimation of her damages, constructed from event records provided by Plannernet. (Dkt. 72-2 at ¶ 6.) The settlement agreement further provides that the named Plaintiff may receive no more than $8,500 as a service award, also known as an incentive award. (*Id.* at ¶ 9(c).) "Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). The decision to approve such an award is a matter within the Court's jurisdiction. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). In general, an incentive award is designed to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as private attorney general." *Rodriguez*, 563 F.3d at 958-59. The Ninth Circuit recently reiterated that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013). Conflicts may arise where "the proposed service fees greatly exceed the payments to absent class members." *Id.*

The Court will determine at the final approval hearing whether Plaintiffs' request for an incentive award is reasonable. The Court notes that, although $5,000 is presumptively reasonable, $8,500 is within the range of the amounts generally awarded by courts in this district for service similar to the named Plaintiff's. *See Nelson v. Avon Prod., Inc.*, 2017 WL 733145, at *7 (N.D. Cal. Feb. 24, 2017); *Covillo v. Specialtys Café*, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014). The average settlement amount in this case is expected to be $661.18. (Dkt. 72-1 at ¶ 13.) Because the named Plaintiff has devoted significant time and effort to assisting in this case, and because the amount of the incentive payment does not seem grossly disproportionate to the average class recovery, the Court concludes that the proposed settlement agreement does not give preferential treatment to any class member. The Court will defer its formal ruling on the exact

1 amount of the service award until the final approval hearing but will not approve more than $8,500

2 for the named Plaintiff. However, in order to ensure that Plaintiff does not receive any preferential

3 treatment, any incentive payment awarded shall be divided into two installments to match the

4 same ratio and timing in which class members receive their recovery.

### iv. Range of Possible Approval.

Finally, the Court determines whether the proposed settlement is roughly fair relative to what class members might be expected to recover at trial. Courts refer to this fairness factor as determining whether the settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9 (internal citation and quotation marks omitted).

Class counsel has "estimated total damages for wages, unpaid meal breaks, unpaid rest breaks, and expenses at $139,760." (Dkt. 72 at 25.) The settlement of $440,000, they therefore assert, "represents well over 100 percent of these estimated maximum damages" and up to nine percent of class members' potential punitive damages. (*Id.*) However, the Court in its certification order limited the class recovery for expenses to those which were subject to proof based on the type of information available to class counsel in making its estimates. Though Plaintiff initially brought claims for failure to reimburse expenses based on three types of expense, including a mandatory application fee Meeting Managers must pay to become Meeting Managers for Plannernet, parking fees, and personal cell phone costs, the Court noted that only the $50 fee was suitable for determination on a class-wide basis, due to the difficulty of calculating damages for the other two categories of expense. (Dkt. 40 at 21.)

Class counsel confirmed at oral argument that each class member is eligible only for a single $50 payment of expenses, according to the Court's order, and that this does not represent the full possible amount of statutory expenses. Yet the proposed class notice refers to class member claims based on "alleged failure to reimburse suppliers of meeting managers for work-related expenses." (Dkt. 72-2 at ¶ 8.) This is ambiguous. Both the Settlement Agreement and the Class Notice must clearly specify that, in reality, class members are not getting a full recovery in

17

the category of expenses due to issues of proof and pursuant to the Court's order; thus, they are only entitled to the $50 reimbursement for the application fee.

Despite the fact that the class members will not fully recover their expenses, the proposed settlement is a good one for the class. At the preliminary approval hearing, counsel for Defendant represented that Plannernet maintains defenses to claims for punitive damages, and class counsel confirmed that, for several categories of claims, a plaintiff would have to meet the high bar of proving scienter to establish entitlement to punitive damages. Given these obstacles to proving punitive damages, coupled with the fact that the settlement agreement provides ample compensation for actual damages, particularly in the areas of damages for wages, unpaid meal breaks, and unpaid rest breaks – even on very small claims that would be difficult to prove and/or prohibitively costly to litigate relative to recovery – the Court is convinced that the proposed settlement amount is objectively fair and reasonable for purposes of the preliminary fairness determination.

After the claims process is completed, the Court will be in a better position to fully assess the actual value of the settlement, and, at that time, "the parties and the Court will be a position to accurately calculate the value of the settlement and compare it to the maximum damages recoverable." *Harris*, 2011 WL 1627973, at \*14. Thus, the Court will defer a final ruling on this issue until after the final approval hearing.

## D. Revision of Class Notice and Implementation Schedule

As currently drafted, the proposed class notice is insufficient. (Dkt. 72-2.) The Court therefore ORDERS class counsel to make the following changes to the notice, and appropriate parallel changes, where required, to the settlement agreement:

    a.    The notice of settlement must clearly indicate that that class members are eligible to receive reimbursement for their $50 application fee as "expenses," but that their settlement will not include other expenses due to difficulty of proving them;

    b.    Both the settlement agreement and the notice of settlement must outline a procedure by which class members may challenge the amount of their individual settlement. Plaintiff shall provide a clear description of what documentation would

18

be required for challenging the amount of an award and a clear description of how funds would be reallocated to cover any adjusted settlement amount;

Plaintiff shall resubmit the proposed class notice and proposed settlement agreement for Court approval no later than May 6, 2019. Further, Plaintiff shall ensure that the informational website for class members includes all pleadings and other court filings from this case no later than May 6, 2019, to be updated on an ongoing basis.

Defendant is currently out of compliance with its reporting obligations under the Class Action Fairness Act, 28 U.S.C. § 1715. Defendant shall remedy that issue by providing the required notices to appropriate state and federal officials May 6, 2019. Defendant shall file proof of compliance on the Court's docket.

**E.     Deadlines and Hearings**

In addition to those outlined above, the Court SETS the following deadlines and hearings in this matter:

   a.   Class counsel shall file a motion for final settlement approval by August 16, 2019;

   b.   Class counsel shall file motions for attorneys' fees and service award by August 16, 2019;

   c.   No later than September 9, 2019, class counsel shall advise the Court regarding how many notices were successfully delivered, how many notices were returned and no valid address found, and how many members either object to or opted out of the settlement.

   d.   The Court will hold the hearing on the motions for final settlement approval, attorneys' fees, and service award on Monday, September 23, 2019, at 9:30 a.m.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's motion for preliminary approval of the class action settlement, subject to the requirements addressed above.

**IT IS SO ORDERED**.

Dated: April 22, 2019



SALLIE KIM
United States Magistrate Judge